PER CURIAM.

The contest in this case is over the probate of the last will and testament of .Charles Feder. The contest was made on the ground of undue influence. The will was admitted to probate by the orphans court of Passaic county.

On an appeal to the prerogative court the decree of the orphans court of Passaic county was affirmed and the appeal dismissed. We have examined the voluminous record with the result that we have reached the same conclusions as the orphans court of Passaic county and the prerogative court. The questions involved are largely questions of fact.

The decree of the prerogative court affirming the decree of the orphans court of ˙Passaic county should be affirmed and the same is hereby affirmed.

*For affirmance*—SWAYZE, TRENCHARD, MINTURN, BLACK, KATZENBACH, WILLIAMS, GARDNER—7.

*For reversal*—THE CHIEF-JUSTICE, PARKER, BERGEN, HEPPENHEIMER, ACKERSON, VAN BUSKIRK—6.

---

AMERICAN MECHANICAL IMPROVEMENT COMPANY,
complainant,

*v.*

DES LAURIERS AIRCRAFT CORPORATION et al., defendants.

[Decided September 22d, 1922.]

On appeal of Des Lauriers Aircraft Corporation et al.

On appeal from a decree or order of the court of chancery advised by Vice-Chancellor Fielder, who filed the following opinion:

"A written agreement, dated April 3d, 1918, between Des Lauriers Aircraft Corporation, of the first part, and complainant of the second part, contains the following recitals and provisions:

"The Des Lauriers Corporation, owning and controlling valuable manufacturing capital and facilities, agrees to furnish such necessary capital and facilities to manufacture all propellers of the type known as the Slate patents for variable pitch propellers, said type of propeller being covered by patents which are the property of the complainant, granted to Thomas B. Slate, and by him assigned to complainant. The complainant grants to the Des Lauriers Corporation the exclusive right to manufacture, use and vend all propellers of said type and design and covered by the Slate patents, and also the exclusive use of such further improvements, patented or otherwise, as Slate or his assignees, or the complainant, may invent or patent, such exclusive rights to extend to the United States and all other countries. The complainant shall receive from the Des Lauriers Corporation as a royalty twelve and one-half per cent. of the selling price of each propeller sold by the Des Lauriers Corporation. The executive board shall have power to fix a scale of prices for the various sizes and types of propellers. In addition to the royalties, complainant shall receive one-half of all net profits remaining after the payment of the expenses of production, including salaries, manufacturing and wage costs, a percentage allowed for depreciation and royalties. The Des Lauriers Corporation agrees to employ, during the period said company is actually engaged in producing propellers, Henry A. Dahlen as president and treasurer, at a salary of $100 per week; Thomas B. Slate as general superintendent of the manufacturing, at a salary of $100 per week and necessary expenses; H. D. King as general manager of sales, at a salary of $100 per week and necessary expenses. That Slate, because of his skill and knowledge as inventor of the design, shall have sole supervision of the construction of propellers and the right to select assistants and workmen. None of the officers mentioned may be removed from his position, or have his salary

reduced, except by action of the executive board. A book of account shall be kept by the president-treasurer, showing the daily business transacted, which record shall be open to inspection of all parties to the agreement. An executive board is created, consisting of Thomas B. Slate, H. D. King, Walter S. Josephson, George Lanzius and Henry A. Dahlen, which board, in addition to the powers before mentioned, shall consider future contracts, future fields of operation, filing of patents and generally all matters relating to the welfare of the business and reach conclusions thereon. Any improvements upon the Slate patented propeller shall inure to the benefit of the parties to the agreement and be subject to the provisions of the agreement and exclusive manufacturing rights therein shall be controlled by the terms of the agreement.

"The bill of complaint, filed November 6th, 1918, alleges that after the making of the agreement the Des Lauriers Corporation undertook the manufacture of the design, but failed to furnish the necessary machinery or help to proceed with the work; that on or about the time the agreement was executed the United States government, after a test of propellers of the Slate type, gave an order for one thousand thereof; that Dahlen, the president-treasurer of the Des Lauriers Corporation, employed a draftsman to design a different propeller and endeavored to have it accepted by the United States government and that the expense incurred by the Des Lauriers Corporation in experimenting on such propeller was charged to the expense of manufacturing the Slate propeller; that Dahlen discharged Slate as superintendent of the factory; that the Des Lauriers Corporation sold one thousand of the propellers for $50,000 and has contracts for three thousand more for the sum of $130,000; but refuses to pay complainant any royalties or to permit complainant to examine its books; that Dahlen claims to have made large advances to the Des Lauriers Corporation and received checks from the United States government on the sale of propellers, which he deposited to his own credit, claiming to reimburse himself for such advances; that Dahlen, for

himself, or another corporation, carried on other work at the Des Lauriers plant and the workmen were intermingled, working part of the time on the Slate propeller and part of the time on other work, and that a large amount of the expense claimed by Dahlen to have been incurred on the propellers was really incurred on other work and fraudulently charged to complainant; that the United States government is greatly in need of propellers of the type in question and if the contract with the Des Lauriers Corporation is abrogated complainant could procure other concerns to manufacture; but so long as the contract remains in force no other concern will manufacture for fear of suits by Des Lauriers Corporation for infringement of the patent. The Des Lauriers Corporation and Dahlen are made defendants and the bill prays that an account may be taken of the amount due complainant under the agreement; that Dahlen account for money received by him for the corporation and of the money advanced by him; that upon final hearing the contract be declared to be null and void and canceled and that defendants be required to account for and pay to complainant the moneys alleged to be due it.

"The defendants' answer admits that complainant is the owner of a device known as a variable-pitch-governor controlled propeller, covered by an United States patent, but that it was anticipated by prior inventions and by prior patents; that the device was originally invented for a driving propeller and that Slate did not attempt to adapt it to a regulating air fan until some time after the patent was issued and they deny any breach of the agreement of their part. By way of counter-claim they allege that the negotiations leading up to the making of the agreement were for the manufacture of a device known as a regulating air fan; that Slate, for complainant, represented that complainant was the owner of letters patent for such air fan and had detailed working drawings of the invention and that models thereof had been manufactured, all of which would be delivered to defendants; that relying on such representations the defendant company entered into the contract, believing

it was securing the right to manufacture air fans under existing letters patent; that when the defendant company called on complainant for drawings and model complainant failed to furnish same and defendant was required to make its own and conduct experimental work, which caused delay and prevented it from manufacturing fans at a profit; that defendant attempted to manufacture fans of the type and character of the model presented by complainant; but after a number of fans so manufactured had been rejected by the government defendant abandoned the attempt and thereafter no fans of that type were manufactured, because the device was impracticable and also because defendant discovered that the patent which complainant owned did not cover the fans and that the fans manufactured were infringements on prior patents; that the representations that complainant had such patent and had working drawings and a model of the fan were false and made with intent to deceive defendants; that the contract is void as against public policy, because the price to be charged the government for the fans was fixed at an exorbitant figure through the control of the executive board therein provided for. The defendants pray that the agreement be declared null and void because of complainant's fraud and misrepresentations and that complainant be compelled to surrender and cancel the same.

"Having stated the agreement that the issues raised by the pleadings, I shall proceed to discuss the facts as gathered from the testimony taken on final hearing.

"September 4th, 1917, letters patent were granted by the United States to Thomas B. Slate for a device therein described as an improvement in air propellers, the general object or principle of the invention being particularly described in the specification annexed to the letters patent and which letters patent were assigned to complainant. The idea or principle of the invention came to the attention of the chief signal officer of the United States army and by letter from his office, dated February 15th, 1918, Slate was requested to furnish information concerning his invention. Upon doing so Slate was further requested to construct a

small model of a self-regulating air fan, embodying the principle of his propeller patent, to be attached to airplanes for the purpose of generating power for radio telegraphy or telephone, by which the operator of an airplane could communicate with the earth, or with other planes. Slate thereupon constructed five models, all of which were tested under the supervision of signal corps officers, and the fifth model was approved and accepted by the signal corps and designated 'Model F. A. 4.' Shortly thereafter, on April 3d, 1918, Slate was introduced to Henry A. Dahlen in Washington, D. C., and negotiations between them resulted in the preparation and execution that day of the agreement which is the foundation of this suit. Slate contends that Dahlen represented that his company had a factory well equipped with machinery and appliances necessary for immediate manufacture of the fan accepted by the government, when in fact the machinery was wholly inadequate for the purpose, while Dahlen contends that Slate represented that he had a working model and working drawings of the fan which could be used immediately for the production of fans in quantities, when in fact he had no such model or drawings. I do not find in such negotiations that there was fraud or willful misrepresentation on the part of Slate or Dahlen. Each failed to exercise ordinary business judgment and precaution to examine what the other had to offer before entering into an agreement, which, had the war continued instead of coming to an end within seven or eight months thereafter, would have involved many hundreds of thousands of dollars. Slate denies representing that he had a working model and working drawings of the fan and I cannot credit Dahlen's assertion to the contrary. A model of the device as applied to air propellers was exhibited at the conference which preceded the execution of the agreement, but no model of the air fan was produced. Slate had prepared five models of the device as applied to an air fan, in his own shop with his own hands, in three weeks' time and had but recently submitted them to the government. The adaptation of the principle of his patent to air fans was new, but the device was the creature

JUNE TERM, 1922.                203

*94 N. J. Eq.*   American, &c., Co. *v.* Des Lauriers, &c., Corp.

of his own brain, and for the purpose of constructing the air fan models for the government tests, he had not needed working drawings and between the acceptance of his model and the execution of the agreement too short a time had elapsed to prepare such drawings. It seems reasonable that he should have believed, as he testified he did, that if unaided he could construct five models in three weeks he could turn one out with the aid of the defendant's company's machinery, workmen and financial backing, in much less time and that while the model was being constructed under his direction a set of working drawings could be prepared also. Dahlen knew that Slate's model had been accepted by the government and it is reasonable to believe that he would therefore not be insistent upon the actual existence of another working model and plans, but would assume that they could be prepared speedily under Slate's supervision. At the time the agreement was executed no order for fans had been obtained from the government, so that no immediate need was apparent for a model and drawings. Had Slate stated at the conference preceding the execution of the agreement that he had a model and working drawings of the device as applied to a' fan, Dahlen would not have been content with being shown only the letters patent, specification and model of the device as applied to a propeller; but he would have requested the production of the fan model and drawings when they met to sign the agreement. I conclude that the circumstances do not bear out Dahlen's testimony on this point. There was certain machinery at the defendant company's plant and from Slate's description of the article to be manufactured, Dahlen may have believed such machinery sufficient for starting the business in which they were about to engage and I shall assume that such was his honest belief.

"The day after the agreement was signed Slate and Dahlen went to the office of the chief signal officer and then and there received an order for one thousand fans, deliveries to start April 22d, and a day or two later Slate came to the defendant company's plant in Newark and for the first time saw for himself what manufacturing facilities it had. He

made no objection to the conditions he found there, but started to prepare a model of his fan. About the same time Dahlen returned to Newark and he saw Slate at his factory April 9th or 10th and talked with him about the model, learned he did not have one, but cannot recall whether they discussed working drawings. In any event, he did not protest that Slate had assured him of the possession of these things, and although he knew that delivery was to commence on the government order April 22d he did not come to the factory again until April 18th. Both model and drawings were then discussed and finding that Slate had not produced either Dahlen called in Funk, who was in charge of the factory and of his interests and told Funk to take charge of getting out the model and drawings. This act supplanted Slate as general superintendent of manufacturing and at least divided the responsibility for future progress of the work between Slate and Dahlen's representative up to May 8th, on which date Dahlen placed Funk in sole charge of the factory and Slate was excluded from any control over manufacturing operations. It will be noted that this procedure was contrary to the provisions of the agreement which placed the control over and power to remove Slate in the executive board. The working drawings were completed May 13th. It has not been shown to my satisfaction that the delay up to April 18th in producing the model and drawings can be attributed wholly to Slate. Slate claims that other work was being carried on at the defendant company's factory; that he was not given a sufficient number of men to assist him and that the machinery was inadequate for the work on which he was engaged. By May 10th Dahlen, or his company, had expended a considerable sum of money for new machinery, which would indicate that when the agreement was executed the machinery on hand was insufficient or unsuited for the business, and I call attention again to the fact that in his shop at Washington Slate had, with his own hands, constructed five models in three weeks. By May 16th the defendant company was producing at the rate of ten fans a day, but it was some time in August before

production was placed on a quantity basis. Dahlen claims to have expended $90,000 to $100,000 for labor, machinery and material before quantity production was reached. This seems incredible, and as he has made it impossible to substantiate his statement by a reference to his company's records, I cannot accept it as true. Shortly after the bill of complaint was filed this court directed the defendant company to retain all its books and records within this state, subject at any time to production and inspection by complainant; yet Dahlen refused permission to complainant's representative to examine these records and removed them from the company's factory in Newark to a building owned by him in an isolated section of Jersey City, occupied only by a caretaker, who received no wages and who paid no rent, and when the caretaker had been away several days the building was entered by thieves and all records which would be of any value in this case were stolen and have not been recovered. I shall add that I regard the whole of Dahlen's testimony as unconvincing, because he was evasive, suffered a loss of memory on matters of importance and contradicted himself frequently, and also because a few weeks after the agreement in question had been signed another man was secretly employed under his direction to design an air fan (called the Pinaud fan), using Slate's idea as the basis for such design, which other fan Dahlen caused to be submitted to the government with the purpose of securing a contract for its manufacture and thus supplant the Slate fan. My conclusion is that the delay in preparation of the model and drawings and in producing the fan cannot be charged to Slate.

"The defendants claim that they rescinded the agreement May 10th, 1918, and thereafter did not manufacture under it. Neither their answer nor the counter-claim set up this defence, but, on the contrary, the counter-claim prays that the agreement may now be declared void. This claim grows out of what transpired at a meeting called by Dahlen on the date mentioned, at which several persons, including Slate, were present, but this did not purport to me a meeting of

the executive board created by the agreement. Dahlen testified that at this meeting he told Slate he was dissatisfied with the lack of progress and with Slate's failure to produce a model and drawings; that he had expended $14,000 on the proposition and had made no headway; that he must rescind the contract with complainant and go ahead and get out to the best of his ability; that Slate replied that he did not blame Dahlen and that he would take matters up with his people in Washington so that a new contract could be presented: that a new contract was presented but not signed by Dahlen. Slate testified that the meeting in question discussed an entirely different subject and that Dahlen said nothing about rescinding the agreement. Whether this conversation as stated by Dahlen occurred or not, what Dahlen claims to have said to Slate was not notice to the complainant of a rescission of the agreement, and the defendant company continued to manufacture the fan up to the following December, and Slate continued on experimental work under defendants' direction. Thus we find that on July 19th, 1918, Dahlen wrote Slate instructing him not to speak to or interfere with the workmen, but that he could go through the factory, inspect the work and report anything he had to say to Funk; that they (defendants) could not get production without Slate's co-operation and that he should make any suggestions he had to Funk. On August 10th, 1918, Dahlen wrote King that he thought they should continue to manufacture the Slate fan rather than another fan and that Slate should spend his time developing designs for a larger propeller. September 17th, 1918, Dahlen told Captain Conant of the signal corps that he expected to pay royalties and half profits to complainant, as provided in the agreement, and about the same time he took a second order from the government for the Slate fan. In an affidavit made November 18th, 1918, and filed in this cause, Dahlen denies that he ever said he did not intend to carry out the agreement and pay royalties. If Dahlen or his co-defendant considered rescinding the agreement May 10th, 1918, their

subsequent conduct shows conclusively that they abandoned such intention.

"The next defence presented is that if complainant contends that the fans manufactured are within the claims on which the Slate patent is based, then complainant ought not be entitled to relief in this court because the Slate patent is an infringement on prior inventions and patents. There has been no eviction or threatened eviction of defendants from the patent rights, but, assuming that the fans were manufactured under the patent, they have continued to enjoy those rights. This defence will not avail, because the licensee cannot set up the invalidity of a patent, the right to use which he holds by license, unless there has been something equivalent to an eviction of the licensee. *Macon Knitting Co.* v. *Leicester Mills Co., 65 N. J. Eq. 138; Ferry-Hallock Co.* v. *Progressive Paper Box Co., 76 N. J. Eq. 1.*

"The defendants further contend that the air fan it manufactured and sold is not a fan of the same model as that which Slate constructed and as was accepted by the government, or, stating the proposition another way, that the fan it manufactured and sold was not the patented invention for which the defendant company agreed to pay royalties. The defendants claim that Slate's patent was for an improvement in air propellers and that the agreement between complainant and defendant company was for the exclusive right to defendant company 'to manufacture, use and vend all propellers of the type and design hertofore described and covered' by said patent. The complainant contends that all the negotiations leading up to the execution of the agreement had to do with the manufacture and sale of an air fan, embodying in its operation the idea and principle involved in the construction of the propeller. Slate's model of the air fan had but recently been accepted by the government, and the probability of securing a contract for its manufacture was under discussion during the negotiations preceding the execution of the agreement, in fact, the order for the fans was secured the following day. In the same discussion the question was raised as to whether the Slate patent was broad

enough to cover the fan and it was agreed that it was sufficiently broad. At the same time Dahlen saw the letters patent and read the specification covering the invention. There was no consideration given to the manufacture of the propeller and no order for it was ever sought or obtained and none were manufactured under the agreement. The fan was the important article when the agreement was executed and the whole efforts of the parties were directed thereafter to producing the Slate fan. Besides the words which I have quoted from the agreement a few lines above, the agreement further gives to the defendant company the 'exclusive use of such further improvements, patented or otherwise, as said Slate or his assignees, or the party of the second part [defendant company] may invent or patent during the life of this contract,' and the agreement further provides that 'any improvements upon the Slate patented propeller herein described, when made by any party to this agreement, shall inure to the benefit of the parties to this agreement and be subject to the provisions of this agreement and the exclusive manufacturing rights therein shall be controlled by the terms of this agreement.' The only changes that appear to have been made in Model F. A. 4 were mechanical in detail of design and were made with the consent of the government to make manufacturing more economical, but had nothing to do with the principle of device, and the fans manufactured by defendant company and accepted by the government were comparable, if not identical, with the Model F. A. 4, and they had stamped thereon 'Signal Corps, U. S. Army, Amico Air Fans, Model F. A. 4, made by Des Lauriers Air Craft Co.' It should be noted here that the 'Pinaud fan,' which the defendants attempted to develop, had not been accepted by the government, and, so far as appears from the evidence, no fans of that design were sold by defendant company. I conclude that the article the defendant company manufactured and sold was the thing they had in mind when the agreement was signed and which they intended to describe therein, namely, an article of the type

and design of the Slate fan, and if the article manufactured and sold varied in any respect from Model F. A. 4, the changes or improvements made by the defendants, patented or otherwise, inured to the benefit of complainant and became subject to the terms of the agreement.

"The final defence presented by defendants is that the agreement should be declared void as against public policy because it provided for an executive board which should have power to fix a scale of prices for the various sizes and types of propellers, the defendants' argument being that the intent of this provision was to exact an exhorbitant price from the government in the war emergency which confronted it. One answer to this contention is that the patent itself creates a monopoly and against the patentee there can be no competition; he may fix any price he chooses for his article and the provision attacked merely passes on to an executive board the right the patentee had. Another answer is that the executive board never fixed a selling price. The price on the first government order appears to have been made by Dahlen and Slate and on subseqent orders or order, by the defendant company or Dahlen. After the defendants have joined in fixing the selling price and have received the same, it would be unconscionable to permit them to avoid the agreement on the ground here urged and retain the whole profit to themselves. Since there is no proof of the purpose of this provision, it may be fairly argued that it was intended to give complainant some measure of control over the selling price, rather than place the right to fix the price wholly with defendants. When the royalties to complainant were discussed and fixed, it may be assumed that the amount of royalties bore some relation to profits and selling price and that the percentage of royalty as fixed by the agreement was to produce a sum which the parties considered just compensation to complainant for its patent rights. If the defendant company had the sole right to fix the sale price, the complainant's compensation could be greatly reduced because the percentage for royalty would remain stationary, while the selling price could be lowered.

"I conclude that the defendants' counter-claim should be dismissed and that complainant is entitled to recover royalties and half profits according to the agreement, and that an account should be taken of the number of fans manufactured and sold, the price received therefor and the net profits made on sales, for the purpose of determining the amount due complainant.

"If there are other items which complainant believes should be covered by the account, I will determine the question when the decree in conformity with my views is presented to me for signature.   Since the agreement vests the exclusive patent rights in the defendant company for the life of the patent and provides for no method of revocation, and since the defendant company has failed to perform its part of the agreement and has ceased manufacturing and has apparently abandoned its rights thereunder, it would be inequitable to further deprive complainant of the use of the patent and there should be a decree that the agreement is null and void and is canceled; in fact both complainant and defendants pray for such a decree.   The defendant company should also be required to execute and deliver to complainant such assignment or transfer as will vest in complainant the title it had in the patent prior to giving to defendant company rights therein.

"By consent of complainant and defendants, Hugh D. King was admitted as a party defendant and filed a cross-bill against Dahlen and Des Lauriers Corporation, setting up an interest under the agreement, which is the subject-matter of this suit, and under a supplemental agreement subsequently entered into between complainant and defendant company.   King alleges that he was employed as general manager of sales for the Des Lauriers Corporation and was to receive as compensation $100 per week and his necessary expenses and five per cent. on the gross selling price of all propellers produced under said agreement; that the defendant company refused to permit him to perform his duties and also refused to pay his compensation or to account for the number of propellers sold.   He prays for an account as

to the amount he is entitled to receive under the agreement. King might not be able to obtain full, adequate and complete remedy at law, because the agreement was not made directly with him and also because under the strict working of the agreement he was to be paid for selling 'propellers,' whereas 'fans' were sold.  This court having assumed jurisdiction of the bill of complaint, has power to give relief to all parties having an interest in the agreement which is the subject-matter of the suit and thus prevent a multiplicity of suits, and the cross-bill will therefore be retained.  The merits of King's claim were not considered at the final hearing because it was desired to first determine whether complainant would be able to maintain its bill.  On proper motion, I will fix a day to take proofs on the question whether or not King has a valid claim against the defendant company."

*Mr. Philemon Woodruff,* for the complainant.

*Messrs. Treacy & Milton* and *Mr. Nathan H. Berger,* for the defendants.

PER CURIAM.

The decree order appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Fielder.

*For affirmance* — THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, WILLIAMS, ACKERSON, VAN BUSKIRK—13.

*For reversal*—None.